UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

GRETCHEN ANNE THIBEAULT,                                    REPORT
on behalf of J.T., a minor,                                and
                                                           RECOMMENDATION
                              Plaintiff,

        v.                                                 12-CV-00377S(F)

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,[1]


                              Defendant.
_____

APPEARANCES:          MYERS QUINN & SCHWARTZ LLP
                      Attorneys for Plaintiff
                      LEWIS L. SCHWARTZ, of Counsel
                      1231 Delaware Avenue
                      Suite 103
                      Buffalo, New York  14209

                      WILLIAM J. HOCHUL, JR.
                      UNITED STATES ATTORNEY
                      Attorney for Defendant
                      KEVIN D. ROBINSON
                      Assistant United States Attorney, of Counsel
                      Federal Centre
                      138 Delaware Avenue
                      Buffalo, New York  14202
                            and
                      STEPHEN P. CONTE
                      Regional Chief Counsel, Region II, and
                      AMANDA LOCKSHIN,Assistant Regional Counsel
                      Office of the General Counsel
                      Social Security Administration

_____

[1] On February 14, 2013, Carolyn W. Colvin became Acting Commissioner of Social Security and,
pursuant to Fed.R.Civ.P. 25 (d)(1), is substituted for her predecessor, Michael J. Astrue, as the defendant
in this action.  No further action is required to continue this suit.  42 U.S.C. § 405(g) ("Any action instituted
in accordance with this subsection shall survive notwithstanding any change in the person occupying the
office of Commissioner of Social Security or any vacancy in such office").

## JURISDICTION

This case was referred to the undersigned on May 9, 2013 for pretrial matters, including preparation of a report and recommendation on dispositive motions. The matter is presently before the court on motions for judgment on the pleadings filed on January 3, 2013, by Defendant (Doc. No. 10), and by Plaintiff (Doc. No. 12).

## BACKGROUND

Plaintiff Gretchen Anne Thibeault ("Plaintiff"), on behalf of her son J.T., a minor, seeks review of Defendant's decision denying Supplemental Security Income based on childhood disability ("SSI") ("disability benefits") under Title XVI of the Social Security Act ("the Act"). In denying Plaintiff's application for disability benefits, Defendant determined that although J.T., a school-age child, has not engaged in substantial gainful activity since June 23, 2008, the disability benefits application date, and suffers from the severe impairments of a learning disability, speech and language delays, macrocephaly, and hydrocephalus, J.T. does not have an impairment or a combination of impairments within the Act's definition of impairment. (R. 11).[1] As such, J.T. was found not disabled, as defined in the Act, at any time through the date of the Administrative Law Judge's decision. (R.20).

## PROCEDURAL HISTORY

Plaintiff protectively filed an application for disability benefits on behalf of her minor son ("J.T." or "the minor child"), on June 23, 2008, claiming a disability onset date of December 25, 2002. (R. 72-74). The application initially was denied on February 18,

---

[1] "R." references are to the page numbers of the administrative record submitted in this case for the court's review.

2009. (R. 46-50). Pursuant to Plaintiff's request, filed March 26, 2009 (R. 53), an administrative hearing was held by videoconference before Administrative Law Judge ("ALJ") Jennifer Whang ("ALJ Whang"), on September 7, 2010. (R. 25-45). Plaintiff, represented by Clifford J. Falk, Esq. ("Falk"), and the minor child, J.T., appeared and testified at the hearing. (R. 25-45). In her decision, dated September 20, 2010, the ALJ found J.T. was not disabled. (R. 20). The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied Plaintiff's request for review on March 21, 2012. (R. 1-4). This action followed on April 27, 2012.

Defendant's answer to the Complaint, filed on August 8, 2012, (Doc. No. 5), was accompanied by the manually filed record of administrative proceedings. On January 3, 2013, motions for judgment on the pleadings were filed by Defendant (Doc. No. 10) ("Defendant's motion"), accompanied by a Memorandum of Law (Doc. No. 11) ("Defendant's Memorandum"), and by Plaintiff (Doc. No. 12) ("Plaintiff's motion"), also accompanied by a Memorandum of Law (Doc. No. 13) ("Plaintiff's Memorandum"). On February 25, 2013, Plaintiff filed a response to Defendant's motion (Doc. No. 17) ("Plaintiff's Response"), and Defendant filed a response to Plaintiff's motion (Doc. No. 18) ("Defendant's Response"). On March 14, 2013, Plaintiff filed a reply in further support of Plaintiff's motion. (Doc. No. 19) ("Plaintiff's Reply"). Oral argument was deemed unnecessary.

Based on the following, Defendant's motion should be GRANTED, and Plaintiff's motion should be DENIED.

## **FACTS**

Since his premature birth on March 21, 2002, at 35 weeks gestation (R. 330),

J.T., the minor child, has been treated for several medical concerns. In particular,

shortly after birth, J.T. had some jaundice which was treated with four days of

phototherapy, and suspected pneumonia, which was treated with antibiotics and

resolved by March 26, 2002. (R. 330-34). When discharged on April 2, 2002, J.T. had

clear and equal breath sounds, and good air exchange, normal muscle tone and

reflexes, and normal hearing, but was to be monitored for apnea (period in which

breathing stops), and bradycardia (slowed heart rate). (R. 330-32). J.T. was also born

with an undescended testicle. (R. 315).

On April 23, 2002, pediatric cardiologist Daniel R. Pieroni, M.D. ("Dr. Pieroni"),

examined J.T., noted a heart murmur was first detected at three weeks of age, and an

April 19, 2002 echocardiogram showed a mild degree of pulmonary valve stenosis,

unassociated with any apnea, which was not expected to cause any cardiac or

pulmonary compromise. (R. 329). SBE prophylaxis was prescribed (course of

antibiotics to protect against bacterial endocarditis), but no restrictions. *Id.*

Although J.T. passed his newborn hearing screening in both ears, because J.T.

received antibiotic medications while hospitalized following birth, J.T. was referred for

an auditory brainstem response evaluation to rule out any hearing loss attributed to his

history of respiratory illness and antibiotics. (R. 341). The evaluation was performed on

May 17, 2002, by licensed audiologist Valerie J. Shields, M.A. CCC/A ("Shields"), who

assessed J.T.'s results as "consistent with normal hearing in the low, mid and high

pitches in both ears," and no evidence of auditory brainstem dysfunction, yet delayed

absolute latencies in the right ear suggested the presence of a conductive component (blockage). *Id.* On May 1, 2002, J.T. underwent an initial pediatric pulmonary – apnea consultation at The Children's Hospital of Buffalo, New York ("Children's Hospital"), at which time J.T. was noted to have "been well" with "great growth" and no "significant alarms." (R. 335-36).

On August 6, 2002, J.T. underwent a developmental evaluation by pediatric nurse practitioner Nancy Lyon, PNP ("PNP Lyon"), at Rainbow Pediatrics, Lewiston, New York. (R. 325-27). At that time J.T. had "normal cognitive, pre-language and motor ability for corrected age" and "normal neurological exam," with reassessment of J.T.'s developmental progress in six months recommended. (R. 327).

An echocardiogram taken on October 4, 2002 showed mild peripheral pulmonary stenosis (heart murmur). (R. 323-24). Upon examination by Dr. Pieroni on November 4, 2002, external examination of heart by stethoscope "revealed a Grade I barely audible early systolic murmur of the second left interspace." (R. 323). Dr. Pieroni's impression was that J.T. "has only mild peripheral pulmonary stenosis" requiring neither restrictions nor SBE prophylaxis, and J.T. "may eventually turn out to have a normal heart," and "anticipate[d] that the murmur may disappear." *Id.*

On December 25, 2002, J.T. was admitted to Children's Hospital in Buffalo, New York, with fever, vomiting, and a full fontanelle (swelling in infant's skull's "soft spot"). (R. 321, 317). A CT scan of J.T.'s head revealed hydrocephalus (fluid accumulation on the brain) and mild macrocrania (enlarged skull), (R. 317), but J.T. was discharged on December 26, 2002. (R. 321-22).

J.T. was referred to pediatric neurosurgeon Veetai Li, M.D. ("Dr. Li"), who, on January 9, 2003, found J.T.'s "neurologic exam and development remained on target." (R. 317). Although J.T.'s head circumference measured at the 95th percentile when corrected for his premature birth, it was "tracking along a normal curve" and Dr. Li did not feel any treatment was warranted at that time, but would continue to monitor the condition. (R. 317-18). At a follow-up appointment on February 6, 2003, Dr. Li examined J.T., reporting J.T. had "intermittent bouts of fullness of his fontanelle," but was "doing well" with head growth "as expected." (R. 316). J.T. had one episode of intermittent vomit in the past month, but Dr. Li had no "overwhelming concerns" regarding J.T.'s hydrocephalus, and planned to examine J.T. in six weeks. *Id.* At a further follow-up appointment on March 12, 2003, Dr. Li reported J.T. was "combat crawling, but not yet pulling himself to a stand, cruising, or walking," and "[t]here have been no periods of unexplained vomiting, irritability, lethargy or seizure activity." (R. 314). J.T. was "awake, alert and interactive with a soft and sunken anterior fontanelle." *Id.* Although J.T.'s head circumference remained above the 95th percentile, J.T. was "paralleling a normal growth curve" with "age appropriate and non focal" neurological examination. *Id.* Dr. Li did not find J.T.'s macrocrania to be "of major consequence at this point," and did not attribute J.T.'s "developmental issues" to his "benign" hydrocephalus. *Id.*

On March 12, 2003, J.T. was examined by pediatric urologist Saul P. Greenfield, M.D. ("Dr. Greenfield"), regarding his undescended left testicle. (R. 315). Dr. Greenfield assessed J.T. as having a retractile testicle, recommended no intervention at that time, but suggested annual evaluation. *Id.*

On April 22, 2003, J.T. was examined by Dr. Pieroni who reported an April 3, 2003 echocardiogram was "normal." (R. 313). Although J.T. was "uncooperative throughout most of the study . . . . no abnormality of anatomy and function was noted." *Id.* Dr. Peironi opined that J.T. "probably does have a normal heart," the peripheral pulmonary stenosis "has resolved" and no restrictions nor SBE prophylaxis was recommended. *Id.*

Dr. Li examined J.T. on June 4, 2003, in connection with Plaintiff's reports that on several occasions J.T. had grabbed his head and cried during the night, but quieted down and fell back to sleep after Plaintiff picked him up. (R. 312). Dr. Li found J.T. to be "paralleling a normal growth curve," "stable," and "exhibiting no new concerns with regard to his mild macrocrania." *Id.*

On July 21, 2003, J.T. underwent a developmental follow-up evaluation from the neo-natal intensive care unit, performed by physical therapist Amy France, PT ("PT France"), at the Robert Warner Rehabilitation Center. (R. 309-10). At that time, Plaintiff had no particular concerns regarding J.T.'s development other than believing J.T. to be "a little behind in terms of his motor development." (R. 309). PT France reported J.T.'s mental examination was "within normal limits," motor examination was "mildly delayed," and adaptive behavior was "good" and "typical" for his age. *Id.* Physical examination showed J.T. "presents with age appropriate range of motion," muscle tone was within normal limits," and good muscle strength. (R. 310). Motor function and movement were good, with gross motor skills characterized as "beginning to ambulate." *Id.* Specifically, J.T. could pull to standing through a half knee, and creeping was his primary means of mobility which was assessed at the 25th percentile on the Alberta Infant Motor Scale. *Id.*

Dr. France's impression was that J.T. had "good language skills, a mild delay in his fine and gross motor abilities." *Id.*

Upon examination by Dr. Li on November 19, 2003, J.T. continued "paralleling a normal growth curve," was "doing well" and "exhibiting no new issues." (R. 308). Although Plaintiff complained of "spells of irritability," Dr. Li was unable to "correlate it with his benign macrocrania." *Id.*

In December 2003, J.T. was examined by ear, nose and throat specialist Parmanand K. Parihk, M.D. ("Dr. Parihk"), for persistent effusion (fluid) in the ears, and recurring otitis media (inflammation of the middle ear). (R. 353). Upon follow-up examination on March 29, 2004, Dr. Parihk reported J.T. had middle ear effusion with inflamed tympanic membrane, and remarked that if J.T.'s middle ear inflammation did not resolved after a 10-day course of omnicef (antibiotic used to treat middle ear infections), tubes would be considered. (R. 303). On May 26, 2004, J.T. underwent bilateral myringotomy (surgical procedure involving tiny incision of eardrum to relieve pressure cause by excessive fluid) and insertion of ear tubes performed by Dr. Parihk, which J.T. tolerated well. (R. 298, 353).

On June 28, 2004, J.T. commenced Early Intervention Program ("EIP") individual therapy sessions for "[s]evere receptive and expressive language delays commensurate with a severe delay in the area of speech production," attending 94 treatments between June 28, 2004 and August 31, 2005. (R. 270). The therapy was provided by speech and language pathologist Dana L. Benjamin, M.S.Ed. CCC/LSLP ("SLP Benjamin"), through Children and Adults with Special Needs.

In July and August 2004, J.T. was evaluated by Dr. Greenfield in connection with Plaintiff's concerns of frequent urination. (R. 284, 292, 293, and 352). A renal/aorta ultrasound performed on July 23, 2004 at Mount St. Mary's Hospital and Health Center in Lewiston, New York, showed a "negative study" which was "limited" based on J.T.'s inability to hold still. (R. 293). J.T's kidneys were "grossly normal in size and appearance," without gross hydronephrosis (swelling causes by obstruction of urinary tract). An August 5, 2004 voiding cystourethrogram performed at Children's Hospital showed significant postvoid residual, but no other significant findings. (R. 292). Upon examination on September 14, 2004, Dr. Greenfield, questioned Plaintiff's concerns that J.T. was frequently urinating given that J.T. was not toilet-trained and still in diapers, and opined J.T. was "normal." (R. 284).

On September 23, 2004, J.T., then 30 months old, was seen by PNP Lyon for developmental follow-up, at which time J.T.'s assessments included mental evaluation of "mildly delayed" with cognitive/visual age of 21.5 months, language age of 22.2 months, gross motor age of 20 months, fine motor age of 18-20 months, and adaptive/behavior assessment included fair quality of response and variable attention span and interest level. (R. 280-81). J.T.'s physical examination showed normal passive tone and range in both upper and lower extremities, and J.T. used both hands, walked, ran, climbed up stairs with railing and downstairs with hand held. (R. 281). PNP Lyon's impressions and summary included delayed cognitive, communication and motor ability, active with a short attention span and impulsivity during assessment, head circumference greater than 97th percentile, which was being followed by neurosurgeon, and Plaintiff was to request an audiology evaluation through Dr. Parihk. *Id.* PNP Lyon

recommended continuing EIP services and requesting an occupational therapy supplemental evaluation. *Id.*

Dr. Li examined J.T. in follow-up for his benign macrocrania on November 3, 2004, at which time Plaintiff reported J.T. was "doing well" but was somewhat concerned about J.T.'s speech pattern, explaining J.T. sometimes "slurs" his words, but was receiving speech therapy. (R. 279). Dr. Li reported J.T. had no periods of unexplained vomiting, irritability, lethargy or seizure activity, and "[i]n terms of development, he is essentially age appropriate in all spheres of development except for perhaps his speech skills as his vocabulary is somewhere between 20-50 words and is just stringing two words together." *Id.* Although J.T.'s head circumference remained above the 95th percentile, J.T. was "essentially paralleling a normal growth curve." *Id.* Dr. Li considered J.T. "stable" and "not exhibiting new concerns with regard to his benign macrocrania," with development "reasonable for his age." *Id.* Dr. Li also opined he had no "lingering concerns" about J.T.'s hydrocephalus with J.T. was "essentially out of the danger zone." *Id.*

An audiological evaluation was attempted on June 2, 2005, but otoscopy (external ear examination with device incorporating light and magnifying glass) and tympanometry (examination of middle ear) could not be completed because J.T. became upset at the equipment, and pure tone testing was attempted with unreliable results, but speech discrimination scores were excellent bilaterally, indicating functional hearing ability in at least the main speech frequencies in both ears. (R. 272). Re-evaluation within one year to obtain frequency specific information was recommended. *Id.*

On October 13, 2005, J.T. was examined at the emergency room of Niagara Falls Memorial Medical Center, in Niagara Falls, New York for nausea, vomiting, and decreased urination. (R. 249-69). Gastritis was diagnosed and J.T. was instructed to follow-up with his primary care physician. (R. 253).

On August 31, 2005, J.T. was discharged from the EIP speech and language services, and transitioned into a Committee on Preschool Special Education ("CPSE") program through Niagara Children Education and Treatment Center ("NCETC"). (R. 270-71). At the time of transition, SLP Benjamin noted that despite making progress, J.T.'s receptive and expressive language skills "continue to be severely delayed." (R. 270).

At an examination by Dr. Li on February 15, 2006, J.T. "present[ed] with concerns with regard to gait stability, [and] urinary tract infections. . . ." (R. 247). J.T. was awake, alert and interactive, but not completely cooperative, resulting in a limited examination. *Id.* J.T. moved his extremities well and had good strength in all muscle groups, his spine appeared straight and normal, and Dr. Li's review of a recent CT scan did not show any major concerns, no lesions, and only mild ventricular enlargement (hydrocephalus) which was slightly better than J.T.'s last CT scan. *Id.* Dr. Li recommended an MRI of J.T.'s entire spine, including his brain, to determine whether any spinal cord malformation was present. *Id.* Because J.T.'s hydrocephalus had been stable and showed no progression, Dr. Li did not believe it was the cause of the reported gait instability. *Id.*

On March 2, 2007, Special Education Teacher Valerie A. Barberio, M.S. Sp.Ed. ("Ms. Barberio"), evaluated J.T., who then attended a preschool class and received

speech/language therapy, and occupational therapy.  (R. 146-49).  Although J.T. was 4 years 11 months old, his academic functioning was at age level 4 years 3 months in general knowledge concepts and comprehension skills, representing a 14 % delay in pre-academic (cognitive) skills.  (R. 146).  J.T., who received speech/language therapy twice a week for 30-minute sessions, had difficulty responding to questions regarding proper responses to various situations and use of objects, and following multi-step directions, requiring directions be repeated and reworded, and also needed reminders to begin work and follow-through to complete activities.  (R. 146-47).  J.T. demonstrated adequate daily living skills for eating, dressing and toileting.  (R. 147).  J.T.'s social skills functioning was assessed at age level 3 years 8 months indicating a 25% delay in social development.  *Id.*  J.T. required prompting to begin seatwork, assistance with directions to complete activities, and redirection to remain on task.  *Id.*  Although generally cooperative and compliant, J.T. had difficulty sharing and taking turns and needed continual reminders to use a quiet, inside voice.  *Id.*  J.T. also received 30-minute sessions of occupational therapy twice a week to address fine motor skills development, yet there were no concerns in the area of gross motor skills, which were demonstrated as adequate.  (R. 147-48).  J.T. independently ambulated throughout the school environment with adequate gait and balance, could independently run and hop, and throw, catch, and kick a ball, ride a scooter board, and independently negotiate stairs. *Id.*  Ms. Barbiero recommended J.T. receive special education consultant services for the 2007-08 school year to address his social, speech/language, and auditory processing skills, and adult assistance to maintain attention to task, task completion, and decreased ability to follow instructions.  (R. 148-49).

On January 14, 2008, School Psychologist Corinna G. Scozzaro ("Ms. Scozzaro"), evaluated J.T., then five years 10 months old and attending kindergarten in a ½ day integrated classroom, where he was classified as a student with a speech and language impairment, and received speech therapy twice a week in thirty-minute group sessions.  (R. 140).  J.T.'s teacher reported J.T. worked at grade level in all areas, and enjoyed participating in classroom activities, but often needed extra time to complete tasks, needed oral directions repeated several times, and became frustrated when he made mistakes.  *Id.*

Ms. Scozzaro administered the Weschler Preschool and Primary Scale of Intelligence-III test ("WPPSI-III"), which showed J.T. with low average range of mental functions suggesting within normal limits cognitive skills, that J.T. processes both verbal and nonverbal information, and suggested "generally well-developed verbal and nonverbal skills with some stronger visual motor and visual perceptual skills noted."  (R. 141-42).  The Bracken Basic Concepts Scale-Third Edition-Expressive test ("Bracken"), was also administered and placed J.T. "within the average range of academic functioning, suggesting age appropriate academic skill development. . . ."  (R. 142). The Beery-Buktenica Developmental Test of Visual-Motor Integration, 5th Edition test ("Beery VMI"), suggested delays with integrating shapes which could affect J.T.'s ability to write letters and number, although J.T. "was able to write his full name very legibly." (R. 143).  When asked, J.T. drew a picture of a person containing a good amount of detail and appropriate for his age.  *Id.*  Ms. Scozzaro reported J.T. was socially and emotionally a "pleasant youngster," who interacted well with her, seemed happy,

enjoyed school, was eager to take and share, noted to be focused, and displayed no social concerns. *Id.*

On February 5, 2008, J.T. was examined by his primary care physician Thomas R. Gerbasi, M.D. ("Dr. Gerbasi"), who found J.T. anxious, but alert, oriented, and appropriate with normal speech. (R. 348-49). On February 21, 2008, J.T. underwent repair of a right inguinal hernia (soft tissue protrusion through abdominal muscles) and hydrocelectomy procedure (surgical correction of collected fluid in the membrane surrounding the testes) performed by Dr. Greenfield at Children's Hospital. (R. 218-39).

An April 1, 2008 Individualize Education Program ("IEP") report recommended J.T. continue receiving speech/language therapy in a group setting twice a week for 30 minute sessions for "a significant delay in speech and language skills, which interferes with participate in age appropriate activities." (R. 150-51). At that time, J.T. was assessed as "making good progress" in kindergarten, "working near grade level," but had difficulty processing oral directions and oral expression skills were delayed. (R. 152).

On July 15, 2008, Plaintiff filed on behalf of J.T. an application seeking disability benefits. (R. 72-74). In connection with the application, Plaintiff completed a Function Report (R. 83-94), and a Disability Report (R. 95-102). Plaintiff described J.T. as having a lazy eye (R. 86), speech difficulties, although J.T.'s speech could be understood most of the time both by people who did, and who did not know J.T. well, (R. 87), was unable to deliver telephone messages or accurately tell jokes and riddles, but could repeat stories, explain actions, and talk with family and friends, but sometimes would "zone out" when someone was speaking to him. (R. 88). J.T.'s ability to progress in learning

was limited as to reading and understanding stories in books and magazines, writing in longhand, spelling most 3-4 letter words, writing a simple story with 6-7 sentences, adding and subtracting numbers over 10, understanding money and making correct change, and telling time, but J.T. had no problem reading capital and small letters, and simple words, reading and understanding simple sentences, and printing some letters and his name.  (R. 89).  No limitations were reported as to physical abilities, interacting with others, or attending to personal needs.  (R. 90-92).  With regard to paying attention and sticking with a task, J.T. was described as being able to keep busy on his own, work on arts and crafts projects, and complete homework, and chores, but limited in his ability to finish things he started.  (R. 93).  Plaintiff listed J.T.'s disabling impairments or conditions as hydrocephalus, macrocrania, obsessive-compulsive disorder ("OCD"), learning delayed, and speech delayed, indicating J.T. became disabled on December 25, 2002.  (R. 96).

On an Activities of Daily Living/Parent Questionnaire completed on J.T.'s behalf on September 8, 2008 (R. 103-04), Plaintiff indicated J.T. spoke "OK" but had difficulty focusing, paying attention, and often "stares off into space. . . ."  (R. 103).  Lately, Plaintiff had observed J.T. having trouble with buttons and zippers.  *Id.*  Although J.T. was showing more independence, he relied on his parents, was easily frustrated, and was throwing temper tantrums.  *Id.*  Plaintiff described J.T. as doing "well in school with the exception of speech and O.T."  (R. 104).  J.T. would respond once the teacher had his attention, which required the teacher to call his name and physically touch him, but that sometimes J.T. did not process information he heard.  *Id.*

In connection with Plaintiff's application for disability benefits, J.T.'s first-grade teacher, Mrs. Seager, completed a Teacher Questionnaire in October 2008.[2]  (R. 129-37; repeated in part at 106-11).  Mrs. Seager assessed J.T. as working slightly below grade level in reading, math and written language, particularly noting J.T. had problems attending to and completing tasks.  (R. 107-08; 134-35).  J.T. was rated as having no problems sustaining attention during play and sports activities, waiting to take turns, changing from one activity to another without being disruptive, and working without distracting himself or others, a slight problem paying attention when directly spoken to, focusing long enough to finish an assigned activity or task, refocusing to task when necessary, organizing his own things or classroom materials, completing class/homework assignments, and completing work accurately without careless mistakes, an obvious problem carrying out single-step instructions, and working at reasonable pace/finishing on time, and a serious problem carrying out multi-step instructions.  (R. 108, 135).  Mrs. Seager could understand almost all of J.T.'s speech when the conversation topic was known, half to 2/3 when the topic was unknown, and almost all after repetition or rephrasing, but J.T. had no problem moving about and manipulating objects, and functioning appeared age appropriate.  (R. 109, 136).

On November 12, 2008, J.T. underwent a consultative examination by Samuel Balderman, M.D. ("Dr. Balderman"), in connection with complaints of hydrocephalous and lazy eye.  (R. 359-62).  Dr. Balderman's examination of J.T. was "normal" in all areas including, *inter alia*, eye evaluation, neurological evaluation, speech, attention span, gait, and muscle tone, his fine motor activity and hand strength were age

---

[2]  The exact date Mrs. Seager completed the Teacher Questionnaire is not provided, only that it was completed one month after the school year commenced.

appropriate, and J.T. related in an age-appropriate manner. (R. 359-61). J.T. was diagnosed as status post hydrocele repair with good prognosis and no physical limitations. (R. 362). J.T. also underwent on November 12, 2008, a consultative evaluation by New York State License Speech and Language Pathologist Amy Atwater, M.S., CCC-SLP ("SLP Atwater"), who reported J.T.'s education performance as "good," and J.T. had no behavior problems at school, and participated in "many age-appropriate activities." (R. 363-64). Upon evaluation, SLP Atwater reported J.T's hearing was adequate for speech reception, oral structures were adequate for speech and sound production, pitch, vocal quality, intensity and rate were age-appropriate without dysfluency, articulation was age-appropriate per the Goldman-Fristoe Test of Articulation, and J.T. was 100% intelligible in all contexts for both familiar and unfamiliar listeners. *Id.* Pragmatic skills posed a slight challenge with J.T. failing to use customary social amenities and making only occasional eye contact. (R. 364). J.T. could follow simple verbal directions, but multi-step directions posed a challenge, requiring prompting and repetition. (R. 365). The Clinical Evaluation of Language Fundamentals, Fourth Edition test ("CELF-4"), was administered to assess receptive and expressive language, with J.T. exhibiting being within normal limits for word structure, a mild delay in formulating sentences and word classes/receptive, a moderate delay in expressive language and core language, and a severe delay in concepts and following directions, recalling sentences, sentence structure, and receptive language. (R. 365). SLP Atwater diagnosed JT with severe receptive language delay and moderate expressive language delay, recommended J.T. continue with speech and language services, which had been beneficial, and indicated that with appropriate intervention J.T.'s prognosis

was good given the impairment's developmental nature, past progress shown, and the severity of deficits.  (R. 366).

On January 5, 2009, State Agency Pediatrician D. Bostic, M.D. ("Dr. Bostic"), reviewed J.T.'s records and opined J.T. had no functional limitations in the domains of moving about and manipulating objects, or health and well-being.  (R. 367-72).  On February 17, 2009, State Agency Pediatrician Dr. Jennifer Meyer ("Dr. Meyer"), also reviewed J.T.'s records and completed a Childhood Disability Evaluation Form, opining J.D. had an impairment or combination of impairments that was severe, but which did not meet, medically equal, or functionally equal a listed impairment.  (R. 381-86). According to Dr. Meyer, J.T. had a less than marked limitation in the domains of acquiring and using information, and attending and completing tasks, but no limitation in interacting and relating with others, moving about and manipulating objects, caring for himself, and health and physical well-being.  (R. 383-84).  Dr. Meyer's assessment considered J.T.'s performance on the WPPSI-III, CELF-4, and in-school testing, as well as reports by J.T.'s teachers, SLP Atwater, and Dr. Balderman.  (R. 383).

On August 6, 2009, J.T. was examined at Summit Pediatrics, P.C., and his general health was described as "good", with J.T. being a "well child" with normal growth, but developmental delay and history of hydrocephalus.  (R. 398).

On his April 12, 2010 Individual Education Program ("IEP") (R. 399-404), J.T. was noted as satisfactorily progressing in reading, but requiring support in applying comprehensive strategies, often giving answers unrelated to the question.  (R. 401). J.T. was making progress in writing with spelling, capitalization, and punctuation skills continuing to require "minimal support."  (R. 401).  J.T. also was making progress in

listening and speech and language skills, with appropriate articulation, but delayed social language and weak comprehension and memory. *Id.* Work was needed on visual motor, motor planning, and fine motor skills, with below average overall coordination, strength and agility, and J.T. needed cues to stay on task, but was making progress demonstrating and accepting responsibility. (R. 402). Math skills were appropriately developing, articulation was appropriate, adaptive daily living and sensory-processing skills were age appropriate, overall perceptual skills were a strength, fine manual control was average, and J.T. got along well with peers and adults, with no social needs. (R. 401-02).

At the September 7, 2010 ALJ hearing (R. 25-45), Plaintiff described J.T. as "growing normally," (R. 29), being ambidextrous (R. 30), and that she first observed J.T. having problems on Christmas Day, 2002 when J.T. was eight months old, and the soft spot on his head was swollen and bulging. *Id.* According to Plaintiff, J.T. has hydrocephalus and a learning disability for which he receives speech, occupational, and physical therapy. (R. 32). J.T.'s teacher had difficulty getting J.T. to pay attention and stay on track. *Id.* Plaintiff testified J.T. was at grade level for reading and math and had no behavioral issues other than staying focused. (R. 34). J.T. got along well with his parents and his brother with whom he lived, as well as with his three step-siblings, and kept his room picked up and straightened with reminders. (R. 35). J.T. was able to attend to most of his personal care with reminders from his mother, and sometimes needed assistance washing his hair. (R. 36). J.T. was active in a bowling club. (R. 37). Although J.T.'s speech was improving with therapy, he still needed the therapy because he continued to have difficulty focusing and understanding others during conversations.

(R. 37). Plaintiff further testified that she did not permit J.T. to participate in contact sports because of his hydrocephalus, that J.T. had trouble following directions, forming sentences, and understanding long sentences, and needed help with some daily activities, such as food preparation and washing his hair. (R. 41-44). The ALJ posed some basic questions to J.T. regarding his school and favorite subjects which, after instruction by the ALJ not to answer with "umhuh," J.T. appropriately answered, albeit with short, often one-word, responses. (R. 38-41).

## DISCUSSION

### 1. Standard and Scope of Judicial Review for Disability Determination

Under the Social Security Act, a court's review of the Commissioner's final decision is limited to determining whether the ALJ's decision is supported by "substantial evidence" in the record. 42 U.S.C. § 405(g); *see Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Acierno v. Barnhart*, 475 F.3d 77, 80-81 (2d Cir. 2007). "The Supreme Court has defined 'substantial evidence' as 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pollard v. Halter,* 377 F.3d 183, 188 (2d Cir. 2004) (citing *Richardson*, 402 U.S. at 401 (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938))). The Commissioner's factual findings are "'binding' when 'supported by substantial evidence,'" yet if an error of law affects the disposition of the case, the court "cannot fulfill its statutory and constitutional duty to review the decision of the administrative agency simply by deferring to the factual findings of the ALJ." *Pollard*, 377 F.3d at 189.

When evaluating a claim, the Commissioner must consider "objective medical facts, diagnoses or medical opinions based on these facts, subjective evidence of pain or disability (testified to by the claimant and others), and . . . educational background, age and work experience." *Dumas v. Schweiker*, 712 F.2d 1545, 1550 (2d Cir. 1983) (*quoting Miles v. Harris*, 645 F.2d 122, 124 (2d Cir. 1981)). If the opinion of the treating physician is supported by medically acceptable techniques and results from frequent examinations, and the opinion supports the administrative record, the treating physician's opinion will be given controlling weight. 20 C.F.R. § 404.1527(d); 20 C.F.R. § 416.927(d)*; Scherler v. Sullivan*, 3 F.3d 563, 567 (2d Cir. 1993).

The Commissioner's final determination will be affirmed, absent legal error, if it is supported by substantial evidence. *Dumas v. Schweiker, supra*, at 1550; 42 U.S.C. §§ 405(g) and 1383(c)(3). "Congress has instructed . . . that the factual findings of the Secretary,[3] if supported by substantial evidence, shall be conclusive." *Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982).

## 2.      Childhood Disability

"To qualify for disability benefits, a child under the age of eighteen must have 'a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.'" *Pollard*, 377 F.3d at 189 (quoting 42 U.S.C. § 1382c(a)(3)(C)(i)).  A three-step sequential analysis is used to determine a child's eligibility for SSI benefits based on a

---

[3] Pursuant to the Social Security Independence and Program Improvements Act of 1994, the function of the Secretary of Health and Human Services in Social Security cases was transferred to the Commissioner of Social Security, effective March 31, 1995.

disability. *Id.* (citing 20 C.F.R. § 416.924(a)). "First, the ALJ considers whether the child is engaged in substantial gainful activity." *Id.* (citing 20 C.F.R. § 416.924(b)). "Second, the ALJ considers whether the child has a 'medically determinable impairment that is severe,' which is defined as an impairment that causes 'more than minimal functional limitations.'" *Id.* (citing 20 C.F.R. § 416.924(c)). "Finally, if the ALJ finds a severe impairment, he or she must then consider whether the impairment 'medically equals' or, as is most pertinent here, 'functionally equals' a disability listed in the regulatory 'Listing of Impairments.'" *Id.* (citing 20 C.F.R. § 416.924(c)-(d), and Part 404, Subpt. P).

In the instant case, the ALJ followed the three-step sequential analysis set forth under 20 C.F.R. § 416.924, and found the first two steps satisfied because J.T. had never engaged in substantial gainful employment, and had several severe impairments including a speech and language delay, a learning disability, macrocephaly, and hydrocephalus, yet J.T.'s impairments did not meet, medically equal, or functionally equal the criteria for any impairment set forth in the Listing of Impairments. (R. 11-20). As such, the ALJ concluded J.T. was not disabled at any time since his disability benefits application was filed on June 23, 2008, and September 20, 2010, the date of the ALJ's hearing decision. *Id.* at 20. Substantial evidence supports the ALJ's decision.

## A. Substantial Gainful Activity

The first step analyzed in determining whether a child is entitled to receive disability benefits is whether the child has engaged in substantial gainful activity. 20 C.F.R. § 416.924(b). A determination that the child is working and the work is substantial gainful activity requires a finding of not disabled regardless of the child's

medical condition, age, education, or work experience.  *Id.*  In the instant case, the ALJ found J.T. was not engaged in substantial gainful activity (R. 11), and that finding is not disputed.

**B.     Severe Medically Determinable Impairment**

The second step analyzed is whether the child has a medically determinable impairment that is severe.  20 C.F.R. § 416.924(c).  If a child does not have a medically determinable impairment, or if the child's impairment "is a slight abnormality, or a combination of slight abnormalities that causes no more than minimal functional limitations," the child will be found not to have a severe impairment and, therefore, not disabled.  *Id.*  In the instant case, the ALJ determined J.T. has several severe impairments, including a learning disability, speech and language delay, macrocephaly, and hydrocephalus.  (R. 11).  That finding is not disputed.

**C.     Functional Equivalent of a Listed Impairment**

The third step of the three-step analysis is whether the child's impairment or combination of impairments "medically" equals the criteria of an impairment included in the "Listing of Impairments," 20 C.F.R. Part 404, Subpt. P, Appendix 1.  20 C.F.R. § 416.924(d).  If the child's impairment meets or medically equals the criteria of a listed impairment, and meets the duration requirement, the child will be found disabled.  20 C.F.R. § 416.924(d)(1).  If the child's impairment does not meet or medically equal the criteria of a listed impairment, then the ALJ must determine whether the functional limitations caused by the child's impairment "functionally" equals a listed impairment.  *Id.*  Otherwise, the child will be found not disabled.  *Id.*

In the instant case, the ALJ found none of J.T.'s impairments, either individually or in combination, meets or is medically or functionally equivalent to the criteria of any listed impairment, and, as such, is not disabled. (R. 11). Plaintiff does not dispute that none of J.T.'s impairments, either alone or in combination, meets or medically equals a listed impairment, but argues the functional limitations caused by J.T.'s impairments functionally equal a listed impairment. Plaintiff's Memorandum at 8-23; Plaintiff's Reply at 2, 5-6.[4]

Because there is no childhood listed impairment for learning disability or speech and language delay, the most relevant general listed impairment in the instant case is 112.00, Mental Disorders and, more specifically, 112.05 mental retardation, which is "[c]haracterized by significantly subaverage general intellectual functioning with deficits in adaptive functioning." 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 112.05 ("§ 112.05"). Generally, the required level of severity is met when a school-age child has a valid verbal, performance, or full scale I.Q. of 70 or below, § 112.05A – E, or is markedly impaired in age-appropriate cognitive/communicative functioning accompanied by "a physical or other mental impairment imposing an additional and significant limitation of function," § 112.05F, a criteria which it is undisputed J.T. does not meet. As such, the ALJ considered whether J.T.'s functional limitations posed by his impairments functionally equals any listed impairment, and found they do not. (R. 11-20). It is this finding Plaintiff challenges.

---

[4] Plaintiff does not specifically state she is not challenging the ALJ's determination that J.T.'s impairment does not equal or medically equal a listed impairment but, rather, refers only to the "functional limitations" caused by J.T.'s impairment, *see*, *e.g.*, Plaintiff's Memorandum at 12 (referring to the six-factor analysis relevant to the "functionally" equivalent determination, and 18 (referring to Social Security Ruling 09-1P in assessing "functional limitations"), and Plaintiff's Reply at 2 (again referring to the six-factor analysis relevant to the "functionally" equivalent determination). Accordingly, Plaintiff's arguments are construed as challenging the ALJ's determination that J.T.'s impairment is not the "functional equivalent" of a listed impairment.

Whether an impairment is the "functional equivalent" of a listed impairment is evaluated under 20 C.F.R. § 416.926a. "Functional limitations" are evaluated in six "domains" including: (i) acquiring and using information; (ii) attending and completing tasks; (iii) interacting and relating with others; (iv) moving about and manipulating objects; (v) caring for oneself; and (vi) health and physical well-being. 20 C.F.R. § 416.926a(b)(1). A medically determinable impairment or combination of impairments functionally equals a listed impairment if it results in "marked" limitations in two domains of functioning or an "extreme" limitation in one domain." 20 C.F.R. § 416.926a(a). A "marked" limitation in a domain refers to "a limitation that is 'more than moderate' but 'less than extreme'" and will be found when the child's impairment seriously interferes with his ability to independently initiate, sustain, or complete activities. 20 C.F.R. § 416.926a(e)(2)(i). A marked limitation is the equivalent of functioning that would be expected to be found on standardized testing with scores that are at least 2, but less than 3, standard deviations below the mean. *Id.* An "extreme" limitation in a domain refers to "a limitation that is 'more than marked,'" the rating given to the "worst limitations," and will be found when the child's impairment "very seriously" interferes with his ability to independently initiate, sustain, or complete activities. 20 C.F.R. § 416.926a(e)(3)(i). An extreme limitation is the equivalent of functioning that would be expected to be found on standardized testing with scores that are at least three standard deviations below the mean. *Id.* In assessing functional equivalence, the interactive and cumulative effects of all impairments for which evidence is submitted will be considered, including for impairments which are not "severe." 20 C.F.R. § 416.926a(a).

In the instant case the ALJ, upon considering all six domains, determined J.T. was not markedly limited in any of them. (R. 14-19). Defendant argues in support of Defendant's motion that the ALJ's decision was supported by substantial evidence in the record, Defendant's Memorandum at 18-19, including that J.T.'s impairments neither meet or medically equal a listed impairment, *id.* at 19-20, nor functionally equal a listed impairment, *id.* at 21-25. Plaintiff's Response filed in opposition to Defendant's motion does not offer any new argument, relying instead on the arguments made in support of Plaintiff's motion, essentially arguing substantial evidence in the record establishes J.T. has marked limitations in two domains, including acquiring and using information, and attending and completing tasks. Specifically, Plaintiff maintains that in making her assessment, the ALJ failed (1) to accord sufficient weight to the opinions of SLP Atwater, Plaintiff's Memorandum at 8-15; (2) to properly evaluate and weigh the opinion of State Agency Review Physician Dr. Jennifer Meyer, *id.* at 15-18; (3) to consider the effects of the supportive setting in which J.T. is placed in school, *id.* at 18-19; (4) to explain her credibility assessment, *id.* at 20-21; and (5) to consider whether J.T. is eligible to receive disability benefits for a closed period of time, *id.* at 21-23. In opposition to Plaintiff's motion, Defendant argues the ALJ properly weighed and evaluated the opinions of SLP Atwater, Defendant's Response at 1-4, and Dr. Meyer, *id.* at 4-6, properly considered J.T.'s functional limitations, *id.* at 6-7, and Plaintiff's credibility, *id.* at 7-9, and Plaintiff's assertion that J.T. was disabled during a closed period is not supported by substantial evidence in the record, *id.* at 9-10. In further support of her motion, Plaintiff reiterates the same arguments set forth in Plaintiff's Memorandum filed in support of Plaintiff's motion. Plaintiff's Reply at 1-8. Plaintiff

particularly maintains the ALJ failed to consider the level of support J.T. requires to function.  Plaintiff's Reply at 5-6.

The court first addresses whether the record establishes J.T. suffered a marked limitation with regard to the two domains at issue, including for a closed period of at least 12 months, as well as the ALJ's assessments of the opinions of SLP Atwater and Dr. Meyer, and the credibility of Plaintiff with regard to both domains.

### 1.    Acquiring and Using Information

The domain of acquiring and using information pertains to how well the child acquires or learns information, and how well the child uses the information learned.  20 C.F.R. § 416.926a(g).  According to the relevant regulations, a normal functioning school-age child, *i.e.*, age 6 to 12, "should be able to read, write, and do math, and discuss history and science," and be able to use these skills both in academic situations and in daily living situations at home and in the community.  20 C.F.R. § 416.926a(g)(2)(iv).  Evidence of limited functioning in the domain of acquiring and using information includes: (1) failure to demonstrate understanding of words regarding space, size, or time; (2) inability to rhyme words or the sounds in words; (3) difficulty recalling important things learned the previous day in school; (4) difficulty solving math questions or computing arithmetic answers; and (5) speaking only in short simply sentences and difficulty explaining concepts.  20 C.F.R. § 416.926a(g)(3)(i)-(v); *see also* Social Security Ruling[5] ("SSR") 09-3p ("SSR 09-3p") (consolidating information from

---

[5] "Social Security Rulings are agency rulings published under the authority of the Commissioner of Social Security and are binding on all components of the Administration."  *Sullivan v. Zebley*, 493 U.S. 521, 531 (1990) (quotation omitted); *see* 20 C.F.R. 402.35(b)(1) (Social Security Rulings "are binding on all

regulations, training materials, and question-and-answer documents regarding the functional equivalence domain of acquiring and using information, and explaining SSA's policy about the domain). In the instant case, the record contains substantial evidence that J.T. was not markedly limited in the domain of acquiring and using information.

In particular, despite J.T.'s delays in speech and language and learning disability, for which J.T. had an IEP and received specialized services, including speech and language therapy, and occupational therapy, in group settings, twice a week for 30 minutes per session, and received within the general education classroom one hour of assistance from an English Language Arts Consultant Teacher, five times per week, (R. 399), J.T. was functioning at grade level in all areas, having been promoted each school year to the next school year. In kindergarten, J.T.'s test scores on the WPPSI-III and the Bracken suggested cognitive skills at the lower end of normal, yet within the range of average, (R. 141-42), showed age-appropriate development of basic school readiness skills, and J.T. worked at grade level in all areas despite needing extra time to complete tasks and had to work on developing attending skills. (R. 140-43). On a Teacher Questionnaire completed in connection with the 2008-2009 school year, when J.T. was in first grade, in ten areas regarding acquiring and using information, Mrs. Seager assessed J.T. as having "a slight problem" reading and comprehending written material, "an obvious problem" comprehending oral instruction, understanding school and content vocabulary, comprehending and doing math problems, understanding and participating in class discussions, providing organized oral explanations and adequate descriptions, expressing ideas in written form, learning new material, and recalling and

components of the Social Security Administration" except with regard to claims subjected to certain relitigation procedures).

applying previously learned material, and having "a very serious problem" applying problem-solving skills in class discussions. (R. 130). Mrs. Seager further commented J.T. "needs 1:1 support to complete most tasks." *Id.* Significantly, nowhere within the record is there any evidence, let alone substantial evidence, that J.T. failed to demonstrate understanding of words regarding space, size, or time, was unable to rhyme words or the sounds in words, could not recall things learned the previous day in school, or spoke only in short simply sentences, difficulties which, if present, would support a marked limitation finding under the regulations. 20 C.F.R. § 416.926a(g)(3)(i)-(v); SSR 09-3p. Although in 2009 Mrs. Seager assessed J.T. with an "obvious problem" comprehending and doing math problems, and a "serious problem" applying problem-solving skills in class discussions, (R. 130), J.T.'s academic achievement, functional performance and learning characteristics were reported on his 2010-2011 IEP, prepared in 2010, as "progressing satisfactorily" in reading, was "independent with phonemic awareness, applying strategies for decoding unknown words, print awareness, fluency, sight work recognition, vocabulary development and motivation/ reading engagement," requiring "support in the area of applying comprehension strategies when reading." (R. 401). J.T. was making progress in writing, including developing handwriting, letter formation, spacing between words, and progressing with purpose, voice, organization, idea development, and language use/word choice, and needed only "minimal support" with spelling, capitalization, and punctuation skills. *Id.* J.T.'s math skills were described as "developing appropriately." *Id.* With regard to speaking, J.T. was "making some progress with using appropriate grammar and vocabulary, speaking for a variety of purposes/audiences, responding to a variety of

texts, using clear and audible speech, talking with fluency and appropriate expression, taking turns when involved in group conversations, and responding appropriately to other readers." *Id.* J.T.'s listening skills were progressing "with attentiveness to spoken language, listening for a variety of purposes, listening respectfully, and understanding and following oral directions." *Id.* J.T.'s oral expression skills were considered "mildly delayed in the areas of grammar and sentence structure," and social language skills had "improved somewhat," yet remained delayed. *Id.* Although J.T.'s comprehension and memory skills were assessed as "weak," this was attributed to his being "easily distracted by his own thoughts and things in the environment" which caused J.T. to miss information presented. *Id.* Despite his delays, J.T. would continue to be placed in a regular, integrated classroom with support services, *id.* at 401-02, which is considered the least restrictive classification of special education. *See Martell v. Astrue*, 2010 WL 2891182, at * 7 (S.D.N.Y. July 8, 2010) (remarking that "claimant's school placement in special education was the least restrictive classification of special education, *just short of general education with support services.*" (italics added)). Although SSR 09-1P(I)(4), requires "the kind, extent, and frequency of help or adaptations the child needs," as well as "the effects of structured or supportive settings on the child's functioning," to be considered, J.T.'s placement in the least restrictive classification of special education does not support a finding of marked or extreme limitation in the domain of the ability to acquire and use information.

Furthermore, insofar as Plaintiff contends the ALJ failed to consider the level of support J.T. needs to function, and whether J.T. could function without such support, as required under 20 C.F.R. § 416.924a(b)(5)(iv)(C), the relevant regulation "does not

command the ALJ to explicitly discuss his consideration of these factors in the decision." *Watson v. Astrue*, 2008 WL 32000240, at * 5 (W.D.N.Y. Aug. 5, 2008) (finding despite not explicitly addressing child's functional capacity both inside and outside of structured setting, the ALJ's consideration of all medial, non-medical, and educational evidence presented by the plaintiff, including how the child interacted with other children during unstructured periods of creation and play, supported finding the ALJ correctly assessed how child would function outside supportive setting). Similarly, in the instant case, the ALJ considered all the medical, non-medical, and educational evidence submitted by Plaintiff, which included evidence that J.T. interacted with his siblings and with other children, participated in a bowling league, and "gets along well with peers and adults" outside the supportive setting. (R. 17). Accordingly, evidence in the record consistently demonstrates that although J.T. does have a learning disability and speech and language delay, J.T.'s ability to acquire and use information is not markedly or extremely limited. Plaintiff's contention thus fails on this ground.

### 2. Attending and Completing Tasks

The domain of attending and completing tasks pertains to how well the child is able to focus and maintain his attention, how well the child begins, carries through, and finishes activities, including the pace at which activities are performed, and the ease with which the child can change activities. 20 C.F.R. § 416.926a(h). According to the relevant regulations, a normal functioning school-age child should be able to, *inter alia*, focus attention in a variety of situations to follow directions, remember and organize school materials, complete classroom and homework assignments, concentrate on

details, not make careless mistakes in work, be able to change activities or routines without distracting himself or others, and stay on task and in place when appropriate. 20 C.F.R. § 416.926a(h)(2)(iv).  Evidence of limited functioning in the domain of attending and completing tasks includes: (1) being easily startled, distracted, or overactive to sounds, sights, movements, or touch; (2) being slow to focus on or failing to complete activities of personal interests such as games or art projects; (3) repeatedly becoming sidetracked from the child's activities or frequently interrupting others; (4) being easily frustrated and giving up on tasks, including those the child is capable of completing; and (5) requiring extra supervision to remain engaged in an activity. 20 C.F.R. § 416.926a(h)(3)(i)-(v).  In the instant case, the record contains substantial evidence that J.T. was not markedly limited in the domain of attending and completing tasks.

Specifically, in connection with J.T.'s July 15, 2008 disability benefits application, although Plaintiff indicated J.T.'s ability to pay attention and stick with a task was limited, and that J.T. did not finish things he started, Plaintiff also indicated J.T. could keep busy on his own, worked on arts and crafts projects, completed his homework, and completed his chores most of the time.  (R. 85, 93).  This was consistent with Dr. Balderman's assessment upon consultative examination on November 12, 2008, that J.T. "appeared to have normal attention span for age," (R. 359-60), and SLP Atwater's November 12, 2008 assessment that J.T. participated in "many age-appropriate activities, including watching TV, listening to music, playing with siblings, doing homework, playing with toys, reading, playing by himself, playing sports, coloring and drawing, playing on the computer, and playing with peers."  (R. 363-64).  SLP Atwater

further observed J.T. "put forth good effort, and attention and concentration were appropriate for the tasks." (R. 364).

On the Teacher Questionnaire completed in connection with the 2008-2009 school year, when J.T. was in first grade, in 13 areas concerning attending and completing tasks, Mrs. Seager assessed J.T. as having a "no problem" sustaining attention during play/sports activities, waiting to take turns, changing from one activity to another without being disruptive, and working without distracting himself or others, "a slight problem" paying attention when spoken to directly, focusing long enough to finish an assigned activity or task, refocusing to task when necessary, organizing his own things and school materials, completing class/homework assignments, and completing work accurately without careless mistakes, "an obvious problem" carrying out single-step instructions, and working at a reasonable pace/finishing on time, and "a very serious problem" carrying out multi-step instructions. (R. 135). It was noted that J.T. "needs 1:1 support to complete many activities at a reasonable pace." *Id*.

In his most recent IEP in the record, for the 2010-2011 school year, it was noted that J.T. was "making some progress with demonstrating and accepting responsibility," yet continued to require cues to stay on task, needed prompts to refocus upon being distracted, and needed assistance keeping his materials organized. (R. 402). Nevertheless, J.T.'s need for cues and prompts to stay on task and refocus was not so severe as to require placement in a special education class but, rather, support services were deemed sufficient to permit J.T. to be placed in a regular, integrated classroom, which is the least restrictive classification of special education. *Martell*, 2010 WL 2891182, at * 7. Despite the fact that J.T. is easily distracted and requires assistance in

the school setting attending to and completing tasks, J.T.'s placement in the least restrictive classification of special education does not support a finding of marked or extreme limitation in the domain of attending and completing tasks. Substantial evidence in the record thus establishes J.T.'s is not markedly limited in the domain of attending and completing tasks and Plaintiff's contention on this ground also fails.

### 3. Treating Source Opinions

Plaintiff argues the ALJ failed to properly evaluate the opinions of consultative SLP Atwater and State Agency consulting and non-examining reviewing physician Dr. Meyer according to the factors set forth in 20 C.F.R. § 416.927(c) and (e).[6] Plaintiff's Memorandum at 8-15 (SLP Atwater), and 15-18 (Dr. Meyer). Defendant argues in opposition that the ALJ properly evaluated the opinions of both SLP Atwater and Dr. Meyer. Defendant's Response at 1-6.

Pursuant to 20 C.F.R. § 416.927 ("§ 416.927"), the Commissioner is required to consider medical opinions in the record along with all other relevant evidence in the record. 20 C.F.R. § 416.927(b). "Medical opinions" include "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [the child's] impairment(s), including [the child's] symptoms, diagnosis and prognosis, what [the child] can still do despite impairment(s), and [the child's] physical or mental restrictions." 20 C.F.R. § 416.927(a)(2). The Commissioner is required to give controlling weight to a treating source's opinion on the issue of the nature and severity of a child's impairment,

---

[6] Although the parties refer to 20 C.F.R. § 416.927(d), effective March 26, 2012, 20 C.F.R. § 416.927 was amended, with subsection (d) renumbered as subsection (c) without substantive changes.

provided such opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record." 20 C.F.R. § 416.927(c)(2). When the opinion of a treating source is not given controlling weight, the Commissioner is required to give "good reasons" in the determination or decision for the weight given the treating source's opinion. *Id.* Otherwise, the Commissioner must consider several factors in determining the weight to give a medical opinion, including (1) the examining relationship between the child and the medical source with more weight given to the opinion of a source who has examined the child than to the opinion of a source who has not, 20 C.F.R. § 416.927(c)(1); (2) the treatment relationship with more weight given to a treating source, 20 C.F.R. § 416.927(c)(2); (3) the length of treatment and frequency of examination, 20 C.F.R. § 416.927(c)(2)(i); (4) the nature and extent of the treatment relationship, 20 C.F.R. § 416.927(c)(2)(ii); (5) whether the medical source's opinion is supported by relevant evidence, particularly medical signs and laboratory findings, 20 C.F.R. § 416.927(c)(3); (6) whether the opinion is consistent with the record as a whole, 20 C.F.R. § 416.927(c)(4); (7) whether the opinion is of a specialist regarding issues related to the specialist's area of expertise, 20 C.F.R. § 416.927(c)(5); and (8) any other factors tending to support or contradict the opinion, 20 C.F.R. § 416.927(c)(6).

### a. SLP Atwater

Plaintiff argues that SLP Atwater, as a qualified speech-language pathologist, was an "acceptable medical source" whose November 12, 2008 opinion that J.T. has a moderate expressive language delay and a severe receptive language delay, based on

J.T.'s scoring in the 2nd percentile in four areas of the CELF-4 examination administered to assess J.T.'s receptive and expressive language function, was entitled to controlling weight. Plaintiff's Memorandum at 12. In particular, J.T. scores in the 2nd percentile in the areas of concepts and following directions, recalling sentences, sentence structure, and receptive language, places J.T. more than two, but less than three standard deviations from the mean, establishing a "marked" disability under 20 C.F.R. § 416.926a(e)(2)(i), and requiring a favorable disposition. *Id.* Plaintiff further maintains other evidence in the record is consistent with SLP Atwater's opinion, including J.T.'s IEP for the 2008-09 school year which indicated J.T. has "'a significant delay in speech and language skills, which interferes with participation in age appropriate activities,'" *id.* at 13 (quoting R. 151), and "that J.T.'s 'listening comprehension and oral expression skills continue to be significantly delayed, which will affect his progress academically,'" *id.* at 14 (quoting R. 151), and J.T.'s IEP for the 2010-11 school year on which it is reported that J.T.'s "'comprehension and memory skills are weak,'" that J.T. "'is easily distracted by his own thoughts and things in the environment,'" and confirms that J.T., despite making "some progress" in speaking and listening, remains significantly delayed. *Id.* (quoting and citing R. 401). Defendant argues in opposition that the ALJ sufficiently addressed SLP Atwater's opinion, and that such opinion does not support a finding of disability. Defendant's Response at 1-4. In further support of Plaintiff's motion, Plaintiff maintains the ALJ failed to consider SLP Atwater's opinion as an acceptable medical source. Plaintiff's Reply at 1-3.

Initially, a qualified speech-language pathologist is an accepted medical source, as defined under 20 C.F.R. § 416.927(a)(2), "for purposes of establishing speech or

language impairments only." SSR 06-03p. Nevertheless, regardless of whether the ALJ properly considered SLP Atwater's opinion as an acceptable medical source, Plaintiff has misconstrued SLP Atwater's opinion.

Simply put, although SLP Atwater's assessment that J.T.'s delay in expressive and receptive language skills is severe, placing J.T. in the 2nd percentile in four areas assessed, or more than two standard deviations from the mean in those areas, is supported by the record, nothing supports the determination urged by Plaintiff that a marked limitation in four areas of expressive and receptive language function is the equivalent of marked limitation in one of the six domains relevant to the determination of whether a child's medical impairment is the functional equivalent of a listed impairment. Rather, as provided for under SSR 06-03p, SLP Atwater's opinion is relevant only to establishing J.T. has a speech and language impairment, an issue which is not disputed. Significantly, as discussed, Discussion, *supra*, at 27-28, the domain of acquiring and using information pertains to how well the child acquires or learns information, and how well the child uses the information learned. 20 C.F.R. § 416.926a(g). That J.T. is delayed in speech and language development therefore does not require finding that J.T. is markedly or extremely limited in acquiring or learning information and using the information learned.

As such, the ALJ's failure to give controlling weight to SLP Atwater's opinion was not in violation of the relevant regulation, *viz.*, 20 C.F.R. § 416.927, or SSR 06-03p, nor does Atwater's opinion, by itself, establish J.T. has a marked limitation in any one of the six domains relevant to the disability determination.

**b.    Dr. Meyer**

Plaintiff argues that the ALJ arbitrarily and erroneously gave controlling weight to the opinion of Dr. Meyer, who never examined J.T. and who did not reference any of the reports prepared by the school psychologist, the special education teachers, or J.T.'s IEPs.  Plaintiff's Memorandum at 16-17.  According to Plaintiff, the ALJ failed to weigh Dr. Meyer's opinion according to the factors set forth under § 416.927(c).  *Id.* at 17-18. In opposition, Defendant argues the ALJ properly evaluated Dr. Meyer's opinion according to the factors under § 416.927(c).  Defendant's Response at 4-6.  In further support of her motion, Plaintiff argues Dr. Meyer ignored evidence crucial to the disability determination, including SLP Atwater's objective findings.  Plaintiff's Reply at 4-5.  A review of the ALJ's decision establishes the ALJ properly evaluated Dr. Meyer's opinion.

In contrast to Plaintiff's assertion that the ALJ arbitrarily gave Dr. Meyer's opinion controlling weight, Plaintiff's Memorandum at 16, a plain reading of the ALJ's decision establishes the ALJ "assigned slight weight" to the opinion insofar as Dr. Meyer opined J.T. has no limitation with regard to the domain of moving about and manipulating objects based on some inconsistency with Dr. Meyer's opinion and other evidence in the record showing J.T. has "mild fine motor difficulties" for which J.T. received occupational therapy.  (R. 14).  The ALJ also considered Dr. Meyer's opinion with regard to the factors set forth under § 416.927(c), referring to Dr. Meyers as "[t]he State Agency's medical consultant" (R. 14), thereby implicitly asserting that Dr. Meyers had no treating or examining relationship of any duration or extent with J.T. given that State

agency medical consultants are recognized as "nonexamining" sources by regulation. 20 C.F.R. § 416.913(c). The ALJ's essential rejection of Dr. Meyer's opinion as to the domain of moving about and manipulating objects demonstrates the ALJ considered the consistency of Dr. Meyer's opinion with the rest of the record. Dr. Meyer's status as a State agency pediatrician is properly considered a medical specialty pertinent to evaluating J.T.'s disability. 20 C.F.R. § 416.913(c); SSR 96-6p. Further, in contrast to Plaintiff's argument, Plaintiff's Memorandum at 16-17, Dr. Meyer's opinion refers to other, relevant reports, including SLP Atwater's assessment, Dr. Balderman's report, Mrs. Seager's evaluation, and the WPPSI-III IQ scores assessed by Dr. Scozzaro, J.T.'s school psychologist, (R. 381-86), and is consistent with J.T.'s IEPs. Moreover, the ALJ was entitled to rely upon a State agency medical consultant's report, so long as such report is not inconsistent with, and is supported by other evidence in the record. 20 C.F.R. §§ 416.912(b)(6) (evidence), 416.913(c) (medical and other evidence of impairment), and 416.927(e)(2) (consultative examination as evidence). Here, no such inconsistency is presented in the record. As such, the ALJ did not improperly evaluate or afford controlling weight to Dr. Meyer's opinion.


### 4. Credibility Determination

Plaintiff argues the ALJ erred by failing to make a credibility assessment of either party using the factors listed in SSR 96-7p. Plaintiff's Memorandum at 20-21. According to Plaintiff, despite several references by the ALJ that Plaintiff's allegations are consistent with the record, the ALJ never mentions that Plaintiff is credible. *Id.* at 21. Defendant argues in opposition that the ALJ's determination that Plaintiff's

assertions were consistent with the record is a sufficient credibility determination. Defendant's Response at 7-8. In further support of her motion, Plaintiff contends the ALJ failed to make the requisite credibility assessment of Plaintiff's allegations. Plaintiff's Reply at 6-7.

Credibility determinations are required when the alleged functionally limiting effects of subjective complaints are not substantiated by objective, medical evidence. 20 C.F.R. § 416.929; SSR 96-7p; *Campbell v. Astrue*, 465 Fed.Appx. 4, at *2 (2d Cir. Jan. 6, 2012) (ALJ may exercise discretion in weighing claimant's credibility in light of other evidence in the record). Nevertheless, it is only "[w]hen ruling that a claimant is not entirely credible [that] the ALJ must provide 'specific reasons for the finding on credibility, supported by other evidence in the case record.'" *Cruz v. Colvin*, 2013 WL 3333040, at * 15 (S.D.N.Y. July 2, 2013) (quoting SSR 96-7p). Significantly, in the instant case, the ALJ never states or even implies that Plaintiff is not credible; rather, a fair reading of the ALJ's decision establishes the ALJ found Plaintiff's statements consistent with other evidence in the record, but that such evidence, including Plaintiff's statements, simply did not establish J.T.'s impairments rendered J.T. markedly limited in two, or extremely limited in one of the six domains relevant to his childhood disability determination. As such, no credibility determination was necessary.

Moreover, insofar as the ALJ repeatedly stated Plaintiff's statements were consistent with other evidence in the record, the plain meaning of the ALJ's characterization of Plaintiff's statements can only be construed as indicating the ALJ found Plaintiff credible. Significantly, neither the relevant regulation, nor SSR 96-7p

specifies any precise language the ALJ was required to use in making such a credibility determination. Accordingly, this argument is without merit.

### 5. Closed Period of Disability

Lastly, Plaintiff argues the ALJ should have considered in the alternative whether the record established J.T. was entitled to a closed period of disability under 20 C.F.R. §§ 416.929 and 416.994, asserting J.T.'s disability did not improve until three years after the onset of his severe limitations. Plaintiff's Memorandum at 21-23. According to Plaintiff, because J.T.'s most recent IEP, dated April 12, 2010, shows that despite significant improvement, J.T. still has moderate limitations as to any relevant domains, it is only logical to infer that J.T. previously had more than moderate, or marked limitations, in the domains of acquiring and using information and attending and completing tasks, requiring a finding that J.T. was disabled from December 25, 2002 until April 12, 2010. *Id.* at 23. In opposition, Defendant argues the April 12, 2010 IEP is not the only evidence that J.T. was not disabled, and that the ALJ was not required to infer that J.T.'s limitations were "marked" before they were "moderate" because such inference would disregard Plaintiff's burden of proof of establishing disability. Defendant's Response at 9-10. In further support of Plaintiff's motion, Plaintiff argues that prior to the April 12, 2010 IEP, several assessments established J.T. had marked limitations in several domains of functioning. Plaintiff's Reply at 7-8.

The ALJ did not err in failing to construe J.T.'s April 12, 2010 IEP as implying J.T. was, previous to the date of the IEP, markedly limited in any specific domains of functioning because the IEP does not address the domains. (*See*, *e.g.*, R. 399-404

(IEP for 2010-2011 school year, devoid of any mention of the six domains of functioning).  As such, the basic premise of Plaintiff's argument on this point fails.  Furthermore, insofar as Plaintiff maintains other evidence in the record establishes J.T. was markedly limited in several domains of functioning prior to the April 12, 2010 IEP, the evidence on which Plaintiff relies, Plaintiff's Reply at 7-8, is the same evidence that establishes only that J.T. was markedly limited in several areas of speech and language, but not in any one of the six domains of functioning.  *See* Discussion, *supra*, at 37.  There is thus no merit to this argument.


## **CONCLUSION**

Based on the foregoing, Defendant's motion (Doc. No. 10) should be GRANTED, and Plaintiff's motion (Doc. No. 12) should be DENIED.


Respectfully submitted,

/s/ *Leslie G. Foschio*
_____
LESLIE G. FOSCHIO
UNITED STATES MAGISTRATE JUDGE

DATED:        September 3, 2013
              Buffalo, New York

**ORDERED** that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of the Court within fourteen (14) days of service of this Report and Recommendation in accordance with the above statute, Rules 72(b), 6(a) and 6(d) of the Federal Rules of Civil Procedure and Local Rule 72.3.

**<u>Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.</u>**

*Thomas v. Arn*, 474 U.S. 140 (1985); *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989); *Wesolek v. Canadair Limited*, 838 F.2d 55 (2d Cir. 1988).

Let the Clerk send a copy of this Report and Recommendation to the attorneys for the Plaintiff and the Defendants.

SO ORDERED.

/s/ *Leslie G. Foschio*

_____
LESLIE G. FOSCHIO
UNITED STATES MAGISTRATE JUDGE

DATED:    September 3, 2013
            Buffalo, New York